UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAY PEMBERTON,

      Plaintiff,

                              Case No. 1:22-cv-739

v.

                              Hon. Hala Y. Jarbou

BELL'S BREWERY, INC.,

      Defendant.

_____/

## OPINION

      This is an employment action brought under the following: the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), Mich. Comp. Laws § 37.1201, *et seq.*; Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101, *et seq.*; and Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*  Jay Pemberton alleges that his former employer, Defendant Bell's Brewery, Inc. ("Bell's" or "the Company"), failed to accommodate his disability; discriminated against him because of both his disability and his age; and fired him in retaliation for engaging in activity protected under both the ADA and Title VII.  Before the Court is Bell's motion for summary judgment (ECF No. 80).

## I. FACTUAL BACKGROUND

### A. Pemberton's Pre-Injury History at Bell's

      Pemberton began working for Bell's as a packager in March 2002.  He was promoted to packaging manager in 2007.  (Pemberton Dep. 56-57, ECF No. 80-1.)  In 2010, he agreed to take a pay cut to move into the brewing department.  (*Id.* at 58, 61-62.)  He was promoted to senior brewer in 2012.  (*Id.* at 88.)  After his 2012 promotion, Pemberton applied for multiple "brewing

lead" positions but never received one.  (*Id.* at 90.)  Instead, Bell's promoted other brewers; these brewers were younger than Pemberton.  (*Id.*)  One such brewer who received a promotion to brewing lead was Josh Pohlmann. [1]

### B. Pemberton's Injury and Subsequent Work Arrangement

The senior brewer position is a "very physical job"  (*Id.* at 53) that requires, among other things, the "[a]bility to frequently lift and/or move up to 25 pounds and occasionally . . . up to 55 lbs."  (Senior Brewer Job Posting 4, ECF No. 80-1.)  Pemberton injured his back twice while employed at Bell's—first in 2016, and then again in December 2018.  (Pemberton Dep. at 27.) His 2018 injury occurred on the job, and he was taken to the emergency room.  (Johnson Decl. ¶ 3, ECF No. 80-4.)  As a result of his 2018 injury, Bell's accepted Pemberton into its workers' compensation program.  (*Id.*)

Pemberton's treating physician placed various physical restrictions on him, including refraining from continuous standing and from lifting or pushing greater than ten pounds.  (12/31/18 Vayo Treatment Form, ECF No. 80-4, PageID.1153.)  These restrictions rendered Pemberton unable to fully perform the essential functions of the senior brewer position.  (Johnson Decl. ¶¶ 7-8.)  To accommodate these restrictions, Bell's initially located light duty work within the brew house that Pemberton could perform.  (*Id.* ¶ 9.)  Pemberton reported that he was satisfied with this accommodation.  (Request for Accommodation ¶ 7, ECF No. 90-4.)

The light duty work ran out beginning in late March 2019.  (Johnson Decl. ¶ 10.)  As a solution, Pemberton suggested to Bell's that he be given a new title and position, "Field and Marketing Sales Specialist."  However, the Company did not have such a position and declined to

---

[1] The parties use various spellings of "Pohlmann."  In his complaint, Pemberton refers to "Pullman."  In its summary judgment motion, Bell's refers to "Pohlman."  The deposition transcripts tend to use the "Pohlmann" spelling, which the Court will also use.

create it.  (*Id.* ¶ 11.)  Instead, Pemberton was placed on an approved leave of absence beginning March 22, 2019.  (*Id.* ¶ 12.)  While on leave, Pemberton received two-thirds of his regular pay. (Pemberton Dep. 20.)

In May 2019, Bell's offered Pemberton work in a "Transitional Work Program" whereby he could work for a non-profit partner while still being paid for full time work by the Company. (Johnson Decl. ¶ 13.)  Pemberton accepted the alternative work arrangement.  He participated in the program until July 2019, when he requested to be removed.  (*Id.* ¶ 16.)  Once again, Bell's placed Pemberton on leave while it explored other available work that could be performed within his restrictions.  During this period, Bell's senior safety specialist re-evaluated the physical requirements of Pemberton's position and again confirmed that the duties would violate his restrictions. (*Id.*)

Eventually, Bell's was able to accommodate Pemberton's restrictions within the brew house by shifting certain work to other employees; he returned to work on October 9, 2019.  (*Id.* ¶ 18.)  Pemberton worked under this accommodation until November 26, 2019, when his restrictions were lifted by his treating physician.  (Pemberton Dep. 221; *see also* Kilmer Dep. 21, ECF No. 80-5.)

### C. Pemberton's Interactions with Josh Pohlmann

Josh Pohlmann became Pemberton's shift lead in July 2018.  (Pemberton Dep. 107.)  In February 2019, Pohlmann delivered Pemberton's annual review.    (*Id.* at 68-70, 109-10.) Following this, Pemberton lodged complaints with Human Resources about Pohlmann's manner of review—namely, that he based his evaluation partially off of "shift notes," an apparently anomalous manner of conducting annual reviews.  (*Id.* at 69; *see also* Yunker Dep. 47-49, ECF No. 80-2.)

3

While reviewing Pemberton's complaint about the review process, Bell's discovered that Pohlmann made several disparaging comments about Pemberton.  For instance, Pohlmann told Pemberton that "the team believed [Pemberton] to be a cancer on the team." (Schuiling Dep. 33, ECF No. 80-3.)  He also told Pemberton that many on the team believed he was faking or "milking" his injury.  (Pemberton Dep. 102, 125-26.)  Eventually, Bell's terminated Pohlmann for his treatment of Pemberton and for impeding its investigation into the matter.  (Yunker Dep. 49.) Pemberton eventually served as a witness for Pohlmann's wrongful termination lawsuit against Bell's.  (Pemberton Dep. 215.)

### D. Pemberton's Internal Position Applications

Pemberton applied to several internal positions throughout the course of his career at Bell's.  (Job Application List, ECF No. 80-1, PageID.929.)  He was rejected for many of them.  In the years following his 2019 injury, he applied for two roles which he ultimately did not receive: "field service representative" in 2020 and "technical brewer" in 2021.  (*Id.*)

According to Bell's, a field service representative is a sales position—but Pemberton lacked sales experience.  (Schuiling Dep. 38.)  Bell's gave the field service representative position to another employee, Michael Dickinson, as he had prior experience at a distributor and "[y]ou can't really beat the training that distributors provide to their sales folks."  (*Id.* at 39.)

Similarly, the technical brewer position went to another employee, Scott Lusk, who was hired over Pemberton in part because of Lusk's relevant education and experience.  (*Id.* at 36.) Lusk held a Bachelor of Science degree in beverage science and had volunteered to assist on projects worked on by technical brewers.  (*Id.* at 37.)

4

### E.  Bell's Investigation into Allegations Against Pemberton

In May 2021, another employee, EE-1,[2] complained to Bell's that Pemberton had made various inappropriate comments towards him.  (Yunker Dep. 29-30.)  EE-1 is a service veteran who served in the United States Marine Corps and who suffered from suicidal ideation and multiple suicide attempts in the years following his return from active service duty.  (EE-1 Dep. 15.)  Pemberton allegedly asked EE-1 questions such as how many people he had killed while on duty and how much money his family would receive if he committed suicide.  (Yunker Dep. 30; EE-1 Dep. 10, 26-27.)

Bell's began investigating EE-1's complaint that same month.  During the investigation, a witness told the Company that Pemberton allegedly made a sexually inappropriate comment about another employee, EE-2.[3]  After learning this, Bell's suspended Pemberton without pay pending the completion of the investigation, although they did not tell Pemberton the precise reason for the suspension.  (Schuiling Dep. 57-59.)

During the initial suspension meeting, Pemberton asked if the investigation had anything to do with a recent Facebook post by another employee, EE-3,[4] detailing date rape allegations. (Schuiling Dep. 31, 57, 101-02.)  He was told it did not.  EE-3's allegations were not being handled by Bell's and were instead referred to a third party for investigation.  (*Id.* at 31.)

Bell's interviewed Pemberton regarding both EE-1 and EE-2 on June 2, 2021.  Pemberton denied the allegations related to EE-2.  Regarding EE-1, Pemberton admitted that he asked the

---

[2] Both parties refer to the non-party employee as "EE-1" given the sensitive nature of the pertinent facts.  The Court will use the same delineation.

[3] Both parties refer to the non-party employee as "EE-2."  The Court will do the same.

[4] Both parties refer to the non-party employee as "EE-3."  The Court will do the same.

question about insurance in the event of suicide but did not admit to the "kill count" question. (Schuiling Dep. 96-99; *see also* Schuiling Notes, ECF No. 90-5, PageID.1476-1477.)

Following the investigation, Bell's concluded that there was a lack of corroboration for the allegations regarding EE-2.  (*See* Schuiling Dep. 118.)  However, the Company decided that discipline was necessary as a result of Pemberton's admitted and alleged comments towards EE-1.  (*See* Pemberton Dep. 189 (discussing Bell's communicated reasons for disciplinary actions); *see also* Employee Discipline Form, ECF No. 80-1, PageID.977-979.)  Finally, Bell's notified the third-party investigator that Pemberton might have information relevant to the separate date rape allegations related to EE-3.  (Seaborn Decl. ¶¶ 4-5, ECF No. 80-7.)

### F. Bell's Offers to Pemberton Post-Investigation

On June 9, 2021, Bell's told Pemberton he was a "toxic employee" and offered him two options. (Pemberton Dep. 185-87.)  He could choose to either stay and agree to a so-called "last chance agreement" or he could accept a severance package.  The last chance agreement would result in various sanctions, including a demotion from senior brewer to brewer and mandatory training, though not a pay cut.  Alternatively, the severance package would result in nine months' pay, health insurance assistance, and outplacement assistance.  The severance package also came with an agreement that Pemberton would participate in the third-party investigation of EE-3's date rape allegations.  (*Id; see also* Proposed Severance Agreement ¶ 10, ECF No. 80-1.)

### G. The End of the Employment Relationship

Pemberton was reluctant to return to Bell's under the last chance agreement because "[i]t would have been uncomfortable."  (Pemberton Dep. 197-98.)  He began negotiating the terms of the severance agreement, securing at least some improvements, including an increase in the payout to a full year's salary and prolonged health insurance coverage.  (*Id.* at 193-97; *see also* Brodie

Decl. ¶¶ 3-4, ECF No. 80-8.)  Nevertheless, Pemberton, through counsel, rejected the severance agreement on July 8, 2021.  (*See id.* at 198; 7/8/2021 Aikens Email, ECF No. 80-8, PageID.1285.)

### H. Pemberton's Pursuit of Administrative and Legal Remedies

Pemberton filed a Charge of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC") against Bell's on March 22, 2022.  He noted the earliest date that discrimination took place as December 1, 2018, and the latest date as May 26, 2021.  In the "particulars" section of the Charge, he explained:

> In or around December 2018 I was injured resulting from an unsafe work practice introduced in or around November 2018.  I was put on light duty in or around October 2019 as a result from this injury and was sent home until I was completely recovered.  Upon my return I was seen as milking it by other co-workers, which caused tension among the workforce.  When applying for Technical Brewer in or around December 2020 or January 2021, I was told I was not hungry enough, nor did I possess a four-year degree.  In or around May 2021, I had a conversation with [EE-1] regarding suicide and life insurance policies.  I was informed by Emily Schuling of Human Resources that this conversation was creating a toxic and hostile work environment and I was told I needed to step down from Senior Brewer to Brewer.  I was never fired, nor did I quit.  I believe I was discriminated against by being demoted due to my disabilities, and passed up for a promotion because of my age, 43.  I believe I was discriminated against because of my disability, and retaliated against for engaging in protected activity, in violation of Title I of the Americans with Disabilities Act of 1990, as amended, and because of my age (43), in violation of the Age Discrimination in Employment Act of 1967, as amended.

(Charge of Discrimination, ECF No. 80-1.)  Pemberton also laid out more details in his EEOC Inquiry Questionnaire ("Questionnaire"), many of which have been discussed by the Court in the preceding sections.  (*See* EEOC Inquiry Questionnaire, ECF No. 80-1, PageID.918-928.)

The EEOC declined to pursue charges on its own and issued Pemberton a Right to Sue Letter on May 16, 2022.  (Pemberton Dep. 104-05.)  He then initiated this lawsuit on August 12, 2022.

## I. The Complaint

In Count I of the complaint, Pemberton alleges that Bell's failed to accommodate his disability—his lower back complications—in violation of the ADA.  He references Bell's refusal to allow him to take light duty work, instead placing him on a temporary leave of absence.

Count II claims a violation of Michigan's PWDCRA by largely repeating the facts alleged in Count I.

Counts III and IV repeat the allegations in Counts I and II under the headline "retaliation." Count III is under the ADA, Count IV is under the PWDCRA.

Counts V and VI repeat the allegations contained in Counts I through IV under the headline "disability discrimination."  Count V is under the ADA, Count VI is under the PWDCRA.

Count VII claims age discrimination in violation of ELCRA.  Pemberton alleges that younger employees were treated differently than him and were held to less stringent standards.

Count VIII claims retaliation for engaging in activity protected under Title VII.  Pemberton alleges that Bell's took adverse employment actions against him due to him serving as a witness in Pohlmann's wrongful termination lawsuit.

Count IX claims retaliation for engaging in activity protected under Title VII.  Pemberton alleges that Bell's took adverse employment actions against him due to his knowledge of facts surrounding the investigation into EE-3.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249

(citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).  Further, summary judgment on affirmative defenses is appropriate.  *Speedeon Data, LLC v. Integrated Direct Marketing, LLC*, 718 F. App'x 333, 337 (6th Cir. 2017).  "For an affirmative defense, the defendant has the burden to show that it is entitled to the defense."  *Id.*

Summary judgment is not an opportunity for the Court to resolve factual disputes. *Anderson*, 477 U.S. at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III.  ANALYSIS

### A. ADA Claims (Counts I, III, and V)

The ADA prohibits an employer from discriminating against an otherwise qualified individual because of his or her disability.  42 U.S.C. § 12112(a).  At its most basic, this prohibition covers "discrimination that is a 'but-for' cause of the employer's adverse decision."  *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 321 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).  Failing to make a reasonable accommodation for an otherwise qualified individual also falls within the ADA's definition of discrimination.  *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007).

The ADA also prohibits discrimination against individuals who complain or file a charge alleging violations of the statute.  42 U.S.C. § 12203(a).  The "ADA is not however, a catchall statute creating a cause of action for any workplace retaliation, but protects individuals only from retaliation for engaging in . . . activity covered by the ADA."  *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014).

An ADA plaintiff must first exhaust administrative remedies.  *Bullington v. Bedford Cnty.*, 905 F.3d 467, 469-70 (6th Cir. 2018).  To exhaust, "a plaintiff must file a timely charge with the

[EEOC]." *Id.*  This requirement is satisfied if the plaintiff explicitly sets forth the claim in the EEOC charge, or if the claim "can be reasonably expected to grow out of" the administrative charges.  *Strouss v. Mich. Dep't of Corrs.*, 250 F.3d 336, 342 (6th Cir. 2001).

Pemberton filed two documents with the EEOC—the Questionnaire and the Charge.  The Sixth Circuit has not definitively answered whether charges contained only in an EEOC intake questionnaire may be considered for exhaustion purposes.  *See Russ v. Memphis Light Gas & Water Div.*, 720 F. App'x 229,  237 (6th Cir. 2017).  Still, courts within this circuit do sometimes consider allegations contained within the questionnaire, particularly when there is also a properly filed charge.  *See, e.g.*, *Sullivan v. Progressive Cas. Ins. Co.*, No. 221CV02314SHMCGC, 2022 WL 1274429, at *4 (W.D. Tenn. Apr. 28, 2022) (collecting district court cases within the Sixth Circuit).  And in *Holowecki*, the Supreme Court noted, "Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies."  *Holowecki*, 552 U.S. at 406.  Thus, for the purposes of evaluating Pemberton's pursuit of administrative remedies, the Court will consider the Questionnaire in conjunction with the Charge.

### 1. Failure to Accommodate (Count I)

Bell's contends that Pemberton failed to exhaust his accommodation claim because his Amended Charge contained no mention of a failure to accommodate.  While true, Pemberton's separate Questionnaire *did* contain facts which would support an accommodation claim.  For instance, just prior to his March 2019 leave of absence, Pemberton reported,

> After several weeks [of working light duty], no more than 4, I was told I could not return to my light duty position and was sent home . . . I have since discovered other employees that have been injured on the job continued light duty for months, so much so that new roles/positions have been created for them.  Positions were created to retain them full time without injury risk.

(EEOC Inquiry Questionnaire, PageID.923.)  Reading the Questionnaire and the Charge together, the Court concludes that Pemberton sufficiently included the accommodation claim in his pursuit of an administrative remedy.  He referenced reasonable accommodations that he had previously received and that others had enjoyed for longer.  This is sufficient to survive the first exhaustion defense hurdle.

Timeliness is another matter.  Bell's argues in the alternative that Pemberton failed to *timely* exhaust his accommodation claim.  "[A] claimant who wishes to bring a lawsuit claiming a violation of the ADA must file a charge of discrimination within 300 days of the alleged discrimination."  *Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 309 (6th Cir. 2000). Pemberton filed his Charge on March 22, 2023; any claims based solely on events taking place before May 26, 2021 are thus untimely.

Even reading Pemberton's Charge and Questionnaire liberally, the last time Pemberton complains of some sort of failure to accommodate was in 2018.  Indeed, Pemberton has failed to establish even during this litigation that he made any reasonable accommodation request to Bell's following his physician's medical release beginning November 29, 2019.  And "[p]laintiffs must . . . propose a reasonable accommodation to succeed" on an ADA accommodation claim. *Tchankpa v. Ascena Retail Group, Inc.*, 951 F.3d 805, 812 (6th Cir. 2020).

Without an allegation in the Charge or Questionnaire that Bell's failed to make a reasonable accommodation requested by Pemberton after May 26, 2021, the Court concludes that Pemberton failed to timely exhaust his accommodation claim.  The Court will grant Bell's summary judgment motion related to Count I.

### 2. Retaliation and Discrimination (Counts III and V)

Bell's also contends that Pemberton failed to properly exhaust his administrative remedies as to his ADA discrimination and retaliation claims.  Exhaustion on these claims is a closer issue.

11

In his Charge, Pemberton wrote, "I believe I was discriminated against by being demoted due to my disabilities . . . ." (Charge of Discrimination, PageID.932.)  He checked the boxes for disability discrimination and retaliation on his Questionnaire.  (EEOC Inquiry Questionnaire, PageID.918.) And in the narrative attached to the Questionnaire, he detailed instances of coworkers viewing him as "milking" his injury, averred that other employees with on-the-job injuries were able to perform light duty work for longer, and generally described an antagonistic environment with his coworkers.  Arguably, Pemberton described an uncomfortable work environment in which his disability played at least some role, culminating in an adverse employment action, within the 300-day administrative remedy period.

To be sure, the EEOC documents do not paint a clear picture of how or when Pemberton was either discriminated against because of his disability or was retaliated against for seeking accommodation.  But discrimination and retaliation claims often involve some degree of extrapolation as they are typically established with circumstantial evidence rather than direct evidence, unlike accommodation claims.  *Compare Rorrer*, 743 F.3d at 1046, *with Kleiber*, 485 F.3d at 868.  Thus, given a policy of construing documents to preserve a plaintiff's statutory rights and the indirect way these claims are resolved on the merits, the Court finds it prudent to pause on the exhaustion issue and turn its focus to the merits.  For sake of analysis, the Court will assume without deciding that Pemberton has properly exhausted his administrative remedies as to his ADA discrimination and retaliation claims.

Moving on to the merits, courts analyze these indirect evidence claims under the familiar *McDonnell-Douglas* burden-shifting framework.  *Rorrer*, 743 F.3d at 1046.  "Establishing a prima facie case . . . is a 'low hurdle.'"  *Id.*  For discrimination, a prima facie case involves a showing by a plaintiff that (1) he is disabled; (2) he is otherwise qualified for the position, with or without

reasonable accommodation; (3) the employer knew of his disability; (4) he suffered an adverse employment decision; and (5) there was a causal connection between the disability and the adverse action.  *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 453 (6th Cir. 2004); *see also Rorrer*, 743 F.3d at 1046.

The prima facie case is similar for retaliation, requiring a showing that (1) Plaintiff engaged in protected activity under the ADA, (2) the employer knew of that activity, (3) Plaintiff suffered an adverse employment action, (4) there was a causal connection between the protected activity and the adverse action.  *Rorrer*, 743 F.3d at 1046.

In either case, if a plaintiff establishes a prima facie case, the burden then shifts to the defendant to offer a legitimate explanation for its action.  If the defendant satisfies this burden of production, the plaintiff must then introduce evidence showing that the proffered explanation is pretextual.  *Id.*

Here, Pemberton's prima facie case is relatively tenuous.  Given that Bell's offered Pemberton a chance to keep his job at the same pay (albeit with a loss of title) or, in the alternative, a full year's severance package, it is not immediately evident that he suffered a cognizable adverse employment action when he chose to walk away.  Further, the causal connections for both the retaliation claim and the discrimination claim rely on significant logical leaps.  Still, the biggest hurdle for Pemberton is that Bell's has offered a convincing legitimate explanation for any adverse action.  Thus, like administrative exhaustion, the Court again finds it prudent to assume without deciding that Pemberton has established his prima facie case.

Bell's has met its burden of production by proffering a legitimate, nondiscriminatory, and nonretaliatory reason for its actions—Pemberton's inappropriate behavior towards EE-1.  At this point, Pemberton can demonstrate pretext "in three interrelated ways: (1) that the proffered reasons

had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action."  *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012).  He has failed to do so.

The only response Pemberton gives related to EE-1 is that EE-1 was not intimidated by Pemberton and viewed him as "essentially a big teddy bear."  (Pl.'s Resp. 17, ECF No. 90.)  First, the Court cannot locate this quote in the deposition transcripts provided by either party.  Second, even assuming EE-1 made that comment, the comment would be out of context at best and actively misleading at worst.  EE-1 explicitly testified that he found Pemberton intimidating (EE-1 Dep. 13), that he was "uncomfortable" with Pemberton's questions and remarks (*id.* at 9, 24, 73), that Pemberton's comments made him feel "emotionally distraught" (*id.* at 26, 51), and that his comments "brought back quite a bit of bad memories . . . a lot of triggering emotions," (*id.* at 46).

Further, Pemberton does not dispute the veracity of at least some of the comments he made to EE-1.  For instance, Bell's has adduced evidence that Pemberton admitted to asking EE-1 about the insurance payout in the event of EE-1's suicide merely because "he was curious about the benefits." (Schuiling Dep. 91-92.)  Pemberton thus has not shown that Bell's proffered reason had no basis in fact.  Nor does Pemberton point to evidence establishing that the proffered reason did not actually motivate the employer's action or how it was somehow insufficient to do so.

Indeed, the evidence points the other way.  The last chance agreement offered to Pemberton was documented in the "Employee Discipline Form" provided to him during the relevant discussion.  In that form, the reasons given for the discipline were that:

> Jay Pemberton engaged in inappropriate and damaging statements/questions to a veteran employee regarding employee's, known to Jay, mental health and personal health history. After this event, Jay acknowledged that he saw a difference in employee and planned on addressing but failed to do so directly or indirectly.

14

(Employee Discipline Form 2, ECF No. 80-1.)  Pemberton acknowledges that he was given the same reason during the discussion.  (Pemberton Dep. 189.)  Bell's Human Resources representative, Emily Schuiling, testified in her deposition that Pemberton's comments regarding EE-1 were the reason for the investigation and featured prominently in her interview with Pemberton on June 2, 2021.  (Schuiling Dep. 15-16).  In her deposition, Bell's executive vice president explained, "So the issue with [Pemberton] asking triggering questions to someone with mental health issues is just that.  It's someone's private mental health information.  We fired [Pemberton's] boss [, Pohlmann,] for discussing his medical condition when we told him not to. We have to treat those situations similarly."  (Yunker Dep. 105.)  In short, Bell's has proffered a legitimate reason for taking adverse action against Pemberton and has substantiated that reason with testimony.

"An employee is not protected when he violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1312 (6th Cir. 1989).  Here, Pemberton was EE-1's supervisor.  Pemberton's comments, some of which he has admitted he made, disrupted the working environment for EE-1.  It was reasonable for Bell's to take some sort of action against Pemberton.  Bell's offered two ways out for Pemberton, one of which would have allowed him to keep working in the brew house in exchange for a title demotion and employee training.  Pemberton has failed to put forth evidence that addresses Bell's proffered legitimate reason for taking adverse action against him; summary judgment for Bell's on Counts III and V is warranted.

### B. PWDCRA Claims (Counts II, IV, and VI)

The "PWDCRA 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim.'"  *Donald v. Sybra,*

*Inc.*, 667 F.3d 757, 763 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 598 (6th Cir. 2002)).  Bell's argues that the PWDCRA's definition of "disability" differs from the ADA's.  Pemberton does not argue that the Court should treat the PWDCRA claims differently than the ADA claims.

Bell's emphasizes the PWDCRA's definition of disability as *"unrelated"* to the individual's ability to perform the duties of a particular job or position.  *See* Mich. Comp. Laws § 37.1202(1)(b) (emphasis added).  Consequently, because lifting, pushing, and pulling are all inherent in the senior brewer position, Pemberton's lower back injury is *related* to his ability to perform his duties and therefore he is *not* disabled under the PWDCRA.  But neither Sixth Circuit case law nor Michigan case law stresses a difference between the ADA and the PWDCRA's definition of disability; indeed, authorities regularly indicate the opposite.  *See Donald*, 667 F.3d at 763; *Chmielewski v. Xermac, Inc.*, 580 N.W.2d 817, 821-822 (Mich. 1998) ("Because the [PWDCRA] definition [of disability] mirrors that of the ADA, we examine federal law for guidance.").  But this case can be resolved on summary judgment without interpreting the PWDCRA's definition of disability.

The Court's analysis for the PWDCRA retaliation and discrimination claims reaches the same result as for the related ADA claims.  Assuming Pemberton can establish a prima facie case, Bell's has proffered a legitimate, nondiscriminatory and nonretaliatory reason for its action against Pemberton.  Pemberton has failed to adduce evidence indicating pretexts and thus summary judgment for Bell's is also warranted for Counts IV and VI.

The PWDCRA accommodation issue requires further analysis.  There is no exhaustion requirement under the PWDCRA; thus, it cannot be said that Pemberton failed to timely exhaust his PWDCRA accommodation claim, unlike his ADA claim.  The PWDCRA does, however, carry

a three-year statute of limitations.  *See Garg v. Macomb Cnty. Cmty. Health Servs.*, 696 N.W.2d 646, 658 (Mich. 2005); Mich. Comp. Laws § 600.5805.  The Complaint was filed on August 12, 2022; any claim premised on conduct before August 12, 2019, is time barred.

Pemberton's accommodation request appears to center on Bell's refusal to give him light duty work.  But there is no evidence of Pemberton actively requesting light duty work, or any other accommodation, after August 12, 2019.  Nevertheless, assuming that Pemberton's requests prior to August 12, 2019 (whether light duty work or the creation of a new position) can be viewed as standing requests that carry into the statute of limitations period, Pemberton's claims fail as a matter of law.

Under the PWDCRA, "An employer . . . has no duty to accommodate the plaintiff by recreating the position, adjusting or modifying job duties otherwise required by the job description, or placing the plaintiff in another position." *Kerns v. Dura Mech. Components, Inc.*, 618 N.W.2d 56, 64 (Mich. Ct. App. 2000).  Here, Pemberton agrees that the senior brewer position was "a very physical job" and that "the essential duties and responsibilities . . . [were] continual lifting, dragging . . . and lifting regularly throughout the duration of the shift."  (Pemberton Dep. 53.) Both Pemberton and Bell's thus view light duty work as an adjustment or modification of job duties otherwise required by the senior brewer position—an accommodation which Bell's had no obligation to offer under the PWDCRA.

Still, it is worth emphasizing the accommodations Bell's *did* make.  Bell's offered light duty work for several months following Pemberton's December 2018 injury.  When the light duty work ran out, despite Bell's active search for such (*see* Johnson Decl. ¶ 9-10; Johnson Emails, ECF No. 80-4, PageID.1173-1198), it placed Pemberton on paid medical leave.  It then placed Pemberton with a nonprofit partner and funded his full-time salary.  When Pemberton no longer

wanted to work at the nonprofit, it placed him back on paid medical leave until it located additional light duty work in October of 2019.  A month later, his medical restrictions were lifted by his physician.  This simply is not indicative of a failure by Bell's to accommodate Pemberton's asserted disability.  Indeed, Bell's appears to have gone beyond what the PWDCRA requires of employers.

Finally, to the extent Pemberton argues that Bell's rejections of his internal job applications to field service representative and technical brewer in 2020 and 2021 represent further failures to accommodate, his argument is unavailing.  First, Pemberton received a release by his physician to return to his full duties in November 2019.  There is no record of him explicitly seeking an accommodation after that time, so the Court would need to interpret these job applications as accommodation requests.  Second, again, the PWDCRA does not require an employer to place an employee in another position simply because they ask to be reassigned.  *Kerns*, 618 N.W.2d at 64. And Bell's ultimately chose applicants whose experience and education credentials better fit the requirements of those roles—it chose an employee with sales experience for the field service representative position and an employee with a background in beverage science for the technical brewer position.  Pemberton lacked both sales experience and relevant post-secondary education. The PWDCRA did not require Bell's to hire Pemberton over more qualified applicants merely because he characterizes his application as a request for reasonable accommodation.

For the foregoing reasons, summary judgment is also warranted for Bell's on Count VI, Pemberton's PWDCRA accommodation claim.

### C. ELCRA Age Discrimination Claim (Count VII)

Count VII lodges Pemberton's age discrimination complaint under Michigan's ELCRA. He does not specifically cite the ADEA, but the analysis is the same.  *Geiger v. Tower Auto.*, 579

F.3d 614, 626 (6th Cir. 2009).  For purposes of analysis, the Court will thus construe the Complaint as bringing both an ADEA and an ELCRA claim.

Because ELCRA does not have the same exhaustion requirements as the ADEA and has a longer statute of limitations period, the Court will examine the merits of Pemberton's state claim first.  Like the PWDCRA, ELCRA has a three-year statute of limitations period.  *See Loffredo v. Daimler AG*, 666 F. App'x 370, 377 (6th Cir. 2016) (citing Mich. Comp. Laws  § 600.5805(1), (10)).  Again, the conduct about which Pemberton complains must have occurred after August 12, 2019.

A prima facie case of age discrimination is similar to a prima facie case for disability discrimination and also uses the *McDonnell-Douglas* framework.  *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001).  Pemberton must offer evidence that (1) he belongs to a protected class, (2) he suffered an adverse employment action, (3) he was qualified for the position, and (4) the job was given to another person under circumstances giving rise to an inference of unlawful discrimination.  If established, Bell's may then offer an age-neutral justification for its actions.  If Bell's meets its burden of production, "the plaintiff must demonstrate that the evidence in the case, when construed in the plaintiff's favor, is 'sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action.'"  *Id.* at 521-22.

Here, Pemberton is over forty years old and is thus covered by ELCRA.  Unlike in the ADEA, he does not need to show that he was replaced or passed over "by a substantially younger employee.  An ELCRA plaintiff need only show replacement by a younger individual."  *Gibbs v. Voith Indus. Servs., Inc.*, 60 F. Supp. 3d 780, 793 (E.D. Mich. 2014).  Within the statute of limitations period, Pemberton applied for two jobs which he did not receive, and he was ultimately offered the choice between a demotion or a severance package.  The Court will assume each of

these was an adverse employment action.  Although he has not presented evidence of such, the Court will also assume that he was qualified for the positions he sought.  In other words, the Court will assume without deciding that Pemberton has established a prima facie case of age discrimination.

Bell's proffered nondiscriminatory reasons for all three adverse employment actions have already been discussed.  The field service representative and technical brewer jobs went to more qualified individuals.  And Pemberton was offered the choice between the last chance agreement and a severance package as a result of his inappropriate behavior towards EE-1.  He has failed to offer evidence that suggests these stated reasons were pretext.

Indeed, the only evidence that Pemberton provides suggesting age discrimination is that he regularly felt compelled to compete with younger employers and that he felt that some younger employers were given a pass on behavior that he would be punished for.  For instance, he thought that EE-1 "was always freaking out, yelling and throwing things.  If I were to act like that I would have been terminated on the spot."  (Pemberton Dep. 84).  But, as Pemberton acknowledges, he "was not terminated for freaking out, yelling and throwing things" (*id.*), nor does he suggest that was why he was passed over for the other internal positions.

Pemberton "must offer evidence showing something more than an isolated decision to reject a minority applicant."  *Hazle*, 628 N.W.2d at 471.  Although he has invoked several adverse actions against him, he has failed to offer evidence rebutting Bell's proffered legitimate reasons.  Pemberton has failed to offer sufficient evidence to create a triable issue for the jury concerning whether age was a motivating factor in Bell's employment decisions.  Summary judgment is thus appropriate for Bell's on Count VII.

### D. Title VII Retaliation Claims (Counts VIII and IX)

Pemberton's final claims charge Bell's with taking adverse employment actions against him in retaliation for him serving as a witness in two separate employment-related proceedings—EE-3's sexual harassment investigation and Pohlmann's wrongful termination suit.  These claims fail for several reasons.

First, like Pemberton's other claims, Title VII retaliation claims are analyzed under the *McDonnell-Douglas* framework.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2006).  Pemberton runs into precisely the same issue with his Title VII claims as he did with his disability and age discrimination claims—even assuming he can establish a prima facie case of retaliation, he has not met Bell's proffered legitimate reasons with sufficient evidence of pretext.  This is sufficient to grant summary judgment to Bell's.

Second, Pemberton's Title VII claims are similar to his ADA accommodation claim in that he failed to properly exhaust his administrative remedies.  Neither the Questionnaire nor the Charge indicates that Pemberton complained of retaliation for engaging in activity protected under Title VII.  Under the "retaliation" section of the Questionnaire, the only reference to Pemberton serving as a witness in either proceeding is when he notes, "I was named as a key witness" in Pohlmann's lawsuit and that "[d]uring deposition, Mark Wilkeson, accused me of being in cahoots with HR to terminate [Pohlmann]."  (EEOC Inquiry Questionnaire, PageID.926.)  Even when reading the documents liberally, it is not clear in either the Questionnaire or the Charge that Pemberton was accusing Bell's of retaliating against him for serving as a witness in any investigation.  Without that clarity, the Court concludes that Pemberton failed to exhaust these claims.

Third, the premises of the claims themselves do not hold up to scrutiny.  With respect to Pohlmann, Pemberton complained to Bell's that Pohlmann was creating an uncomfortable

environment for Pemberton because of his workplace injury.  Bell's investigated Pemberton's complaint and then fired Pohlmann as a result.  Pohlmann then, apparently, initiated a wrongful termination lawsuit against Bell's in which Pemberton was deposed as a witness.  Pemberton does not articulate how or why his participation as a witness in Pohlmann's wrongful termination lawsuit—a lawsuit initiated by Bell's in response to Pemberton's own internal complaint—motivated Bell's to then take adverse action against Pemberton.  Further, it is unclear whether Pohlmann's wrongful termination suit was brought under Title VII; if it was not, Pemberton's participation in that lawsuit was not protected under Title VII anyways.  *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2020) ("A plaintiff must demonstrate that her opposition was reasonable and based on a good-faith belief that the employer was acting in violation of Title VII.").

With respect to EE-3, the Company actively tried to get Pemberton to engage with the third-party investigators, but Pemberton refused.  This was an explicit condition of the last chance agreement that Pemberton rejected.  Pemberton testified that he never cooperated in that investigation.  (Pemberton Dep. 192.)  But even if Pemberton ultimately did participate in some investigation or lawsuit related to EE-3, he has failed to connect the dots to establish this as the motivating factor behind Bell's employment actions rather than his behavior towards EE-1.

Based on the foregoing, Bell's is entitled to summary judgment on Pemberton's Title VII retaliation claims in Counts VIII and IX.

## IV. CONCLUSION

The Court concludes that summary judgment for Bell's is warranted as to each claim.

Pemberton has failed to create a genuine dispute of material fact for any of his claims.  The Court

will grant Bell's motion.

An order will enter consistent with this Opinion.


Dated: <u>March 18, 2024</u>                              <u>/s/ Hala Y. Jarbou</u>
                                                HALA Y. JARBOU
                                                CHIEF UNITED STATES DISTRICT JUDGE